UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD KHALIL, individually;

      Plaintiffs,

-v-

No.
Hon.

ERNEST WILSON, in his individual
capacity; KAREN MILLER, in her
individual capacity; and DERRYCK THOMAS,
in his individual capacity;

      Defendants.

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, EDWARD KHALIL, individually, by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files his Complaint against the Defendants in this civil action, stating unto this Court as follows:

1. This is an action for damages brought pursuant to 42 U.S.C. §§1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution, against Defendants, ERNEST WILSON, in his individual capacity; KAREN MILLER, in her individual capacity; and DERRYCK THOMAS, in his individual capacity.

2. Jurisdiction is founded upon 28 U.S.C. §1331 and 28 U.S.C. §1343.

3. Forum is proper based on the situs of the incident, which occurred in

the CITY OF DETROIT.

4. At all pertinent times Plaintiff, EDWARD KHALIL, was a United States citizen.

5. At all pertinent times, Defendant, ERNEST WILSON ("WILSON"), was employed as a Sergeant by the Detroit Police Department ("DPD") and was acting under color of law.

6. At all pertinent times, Defendant, KAREN MILLER ("MILLER"), was employed as a Police Officer by the Detroit Police Department ("DPD") and was acting under color of law.

7. At all pertinent times, Defendant, DERRYCK THOMAS ("THOMAS"), was employed as a Police Officer by the Detroit Police Department ("DPD") and was acting under color of law.

## GENERAL ALLEGATIONS

8. On September 15, 2011, 51-year-old Anthony Jones was fatally shot in Detroit, Michigan, where he had been illegally stripping copper from a building that was being rehabilitated. He was shot and killed as he attempted to exit the building. Police originally charged one of the building's co-owners, 28-year-old Edward Khalil, and the building's security guard, Charles Shavers, with the shooting.

9. Based on threats and coercion from Defendants, Shavers would later

accept a deal to plead guilty to a charge of accessory-after-the-fact and receive a sentence of 18-months' probation in exchange for testifying against Plaintiff.

10. Khalil co-owned the 115-year-old building with Parminder ("Parry") Saroya, who put up the funds to buy the building. Khalil contributed "sweat equity."

11. Prior to the shooting, police had been summoned many times because people were breaking into the Covington building to remove copper and other materials. The security guard had called police so often that police eventually stopped coming.

12. Shortly after 4 a.m. on September 15, 2011, Saroya received a call from a tenant in one of his other buildings saying that there appeared to be a break-in at the Covington building. Saroya, an Indian emigrant living in Canada, was staying with his son, Jason, at the Westin Hotel in Southfield, Michigan, about 11 miles from the Covington building. Saroya called Khalil, who was at home in West Bloomfield, Michigan, and they both drove to the Covington building.

13. As Khalil drove to the apartment building, he used his cell phone to call 911 and to call Charles Shavers, a recently hired maintenance/security guard who lived just across the alley from the Covington building. Khalil called several times before he was able to rouse Shavers.

14. At 4:18 a.m., two police officers met and spoke with Khalil and the

3

Saroyas at the building. Because the radio call mentioned that an armed man was inside the building, the officers declined to enter, saying it was not safe. Two more officers were summoned; they also refused to enter. Finally, after a lieutenant arrived, the five officers as well as Khalil and the Saroyas went into the basement to review video from security cameras. However, the recording equipment had been disabled at about 1:30 a.m. The police searched the first two floors, which had lighting, but did not search the third or fourth floors, which were dark.

15. According to a video from a security camera on a building across the alley, Khalil left to drive home at about 5:55 a.m. The Saroyas left at the same time.

16. Meanwhile, Jones and Arthur Richardson, who had broken into the building, had been hiding in a closet on the third floor. After the police left, Jones tried to leave the building by crawling out of a first-floor bathroom window but was fatally shot in the neck with a slug from a 12-gauge shotgun. When Jones was shot, Richardson ran back to the third-floor closet.

17. At 6:06 a.m., security video from the building across the alley showed the security guard, Shavers, getting off the elevator with a long gun. He went into the stairwell. The security video from the alley showed him walking with the gun. At 6:07 and 17 seconds, he moved out of the camera's view as he turned the corner to the side of the Covington building. He was next seen coming back into the

camera's view 38 seconds later. He was running and the gun could not be seen.

18. Shavers then called Plaintiff, who was heading west on the Lodge freeway several miles from the property. Shavers told Plaintiff that he had shot the scrapper. Plaintiff then returned to the apartment building.

19. A tenant had heard the shooting and saw Shavers running with a long gun in his hand. The tenant called Jason Saroya and advised him of the incident. Jason and Parry Saroya then returned, arriving at the apartment building at the same time as plaintiff.

20. Shavers advised the men that he had shot the intruder.

21. Khalil called 911 at 8:15 a.m. to report the shooting.

22. When police arrived, they spoke to Plaintiff, Shavers, and the Saroyas. Shavers told the reporting officers, Joseph Molinaro and Douglas McDonald, that he shot the intruder.

23. Police officers investigated the crime and spoke to several neighbors. At least two neighbors told officers that the security officer, Shavers, shot the trespasser. Officers told one neighbor, *"That Arab shot a brotha in cold blood; you need to make a statement."* When the neighbor told the officers, *"The Chaldean (Plaintiff) didn't shoot a brotha; a brotha (Shavers) shot a brotha,"* the officers refused to take a statement.

24. The police officers reported the neighbors' statements to Defendants,

WILSON, MILLER, and THOMAS.

25. Defendants, THOMAS and WILSON, interviewed Parminder "Parry" Saroya, Plaintiff's business partner in the apartment redevelopment project. They would have known that Mr. Saroya spoke with a heavy Middle Eastern accent, while Plaintiff had no foreign accent.

26. MILLER, the Officer-in-Charge ("OIC") at the time,[1] was aware of all developments and evidence obtained in the case, in accordance with the reporting policies of the DPD, a paramilitary organization.

27. On September 20, Khalil, Shavers, and Saroya were arrested. Khalil and Shavers were charged with murder and felony-firearm; Saroya, a Canadian citizen, was deported.

28. Defendants threatened Shavers with pursuing the murder charges against him unless he testified against Plaintiff. Defendants were aware that Shavers had admitted to shooting the victim. If Shavers agreed to testify against Plaintiff, Defendants promised Shavers he would be given a tremendous deal and would serve no jail time. Shavers later agreed to testify for the prosecution. In return, he was allowed to plead guilty to being an accessory after the fact to a felony and was sentenced to probation for 18 months.

---

[1] Miller retired before the first trial and Defendant, Derryck Thomas, assumed the role of OIC.

29. Shavers testified that he gave the shotgun to Plaintiff and bent down to tie his shoes. While tying his shoes, he heard a shotgun blast. Plaintiff then allegedly came back and handed Shavers the shotgun.

30. Neither MILLER nor THOMAS, the Officers-in-Charge ("OIC") of the homicide case over the course of two trials, told the prosecutor at any time that Mr. Saroya had a heavy accent, a fact that would have directly impeached the testimony of one of the state's witnesses, Shantele Henderson, who testified that after the shooting, she heard Plaintiff state, with a heavy Middle Eastern accent, *"I killed that mother\*\*\*er!"*

31. None of the Defendants told the prosecutor that surveillance video showed Shavers in possession of the murder weapon at all relevant times, a fact that would have proven exculpatory and would have impeached the testimony of the witnesses, including Shavers, Henderson, and Richardson, as it would have shown that Plaintiff was not present when the shooting occurred.

32. Testimony was introduced from an Alcohol Tobacco & Firearms ("ATF") cell phone expert that Plaintiff's cell phone was miles away at the time of the shooting and testimony from a Detroit police officer that Shavers admitted to shooting the victim.

33. During the course of discovery before trial, Defendants learned that Shavers placed a call to Plaintiff's cell phone just after the shooting at 6:06 a.m.,

7

and that Plaintiff's phone was several miles away from the apartment building. Defendants coerced Shavers to fabricate another piece of evidence, indicating that a woman answered Plaintiff's cell phone at 6:06 a.m., which would allow the police to suggest that Plaintiff was still at the scene of the murder.

34. At trial, Shavers testified to hearing a woman answer Plaintiff's cell phone, which the prosecutor used to claim Plaintiff was actually at the murder scene at 6:06 a.m.

35. Defendants, as investigating officers, also reviewed surveillance video taken from nearby apartments. The video revealed that Shavers always possessed the shotgun and that Plaintiff was nowhere near the scene at the time of the shooting. Before trial, Defendants deliberately and knowingly discarded the DVR that housed the critical video.

36. MILLER, the OIC, omitted from her Investigator's Report/Request for Warrant that surveillance video showed that Shavers possessed the murder weapon at all relevant times.

37. On December 5, 2012, Plaintiff was convicted of first-degree murder.

38. On December 20, 2012, Plaintiff was sentenced to life in prison without the possibility of parole. *Id*.

39. On December 17, 2013, Plaintiff's convictions were vacated when the court ruled that he was denied a fair trial by his counsel who denied him the

opportunity to testify in his own behalf.

40. In a new trial in March 2014, Plaintiff was convicted of second-degree murder and felony firearm on largely the identical evidence from the first trial. He was ultimately sentenced to serve 14 – 25 years for the murder conviction and 2 years for the felony firearm conviction, to be served consecutively. *Id*.

41. Neither of the two witnesses who provided exculpatory evidence for Plaintiff was ever called as a witness in either trial.

42. The prosecutor did not know the identity of either witness, as they had not been disclosed to the prosecutor by the Defendants.

## POST-CONVICTION EVENTS

43. In 2020, the Wayne County Conviction Integrity Unit investigated Plaintiff's case. It discovered new evidence, including an interview with Jason Saroya, Plaintiff's partner's son, who never testified at either trial. Saroya told the CIU that he and his father arrived at the apartment building after hearing word that a man had been shot by Mr. Shavers. He told the CIU that Plaintiff arrived at the apartment building in his vehicle at the same time as the Saroyas. He said that he and Plaintiff discovered the body together. Saroya further stated that he never saw Plaintiff with a gun in his hand. Saroya stated that it was clear to everyone who arrived (Khalil and both Saroyas) from all of the evidence and meeting with Mr. Shavers, that Shavers shot the victim. Finally, Saroya stated that his father has a

heavy foreign accent, a critical point to contradict the trial testimony of an "earwitness" to the crime.

44. As a result of the newly-discovered evidence, the CIU submitted the case to Wayne County Prosecutor, Kym Worthy. Prosecutor Worthy agreed that Plaintiff was factually innocent of these crimes and agreed to a full and complete exoneration.

45. On July 13, 2020, the prosecution moved to vacate the conviction and dismiss the charges. In so doing, the Prosecutor stated, *"[t]he newly-discovered evidence in this case substantiates that Mr. Khalil was not involved in the crimes for which he was charged and convicted of in this case."* The Prosecutor's statement indicated that the results of the CIU investigation *"warrants that the convictions and sentences in this case be vacated and all charges be dismissed in the best interests of justice."*

46. But for Defendants' conduct, as set forth below, there would have been no probable cause for an arrest warrant, much less a trial and conviction.

47. As a direct and proximate result of the Defendants' conduct, as set forth below, Plaintiff, Edward Khalil, suffered the following injuries and damages:

    a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over seven years;

    b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional

    distress of being charged with murder; being wrongfully convicted of crimes the Defendants knew he did not commit;

c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Fright, shock, indignity, humiliation, outrage, and embarrassment of being wrongfully charged and imprisoned for murder;

e. Loss of enjoyment of daily activities;

f. Not being able to attend the funerals of several family members;

g. Physical injuries suffered in prison;

h. Loss of employment opportunity, past income, and future earning capacity;

i. Restricted and/or complete loss of all forms of personal freedom and physical liberty, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, recreational activities, and personal expression;

j. Many of Plaintiff's injuries and damages are likely to be permanent;

k. Other damages which may be revealed through discovery.

## COUNT I

## 4TH and 14th AMENDMENT FBRICATION OF EVIDENCE BY ALL DEFENDANTS

48. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

49. At all times, Plaintiff had a constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence by a government officer acting in an investigative capacity.

50. At all times, Plaintiff had a constitutional right, secured by the 14th Amendment, not to be deprived of due process through trial as a result of fabrication of evidence by a government officer acting in an investigative capacity.

51. Each Defendant violated Plaintiff's constitutional rights, set forth above, by knowingly and intentionally fabricating Charles Shavers' statement and later testimony that he gave the shotgun used in the shooting to Plaintiff immediately before hearing the shotgun blast and being handed the gun by Plaintiff just after the shooting.

52. The fabricated evidence resulted from threats of charging Shavers with the murder unless he implicated Plaintiff as the shooter and promising Shavers that he would not do any jail time if he blamed Plaintiff for the killing.

53. Each Defendant violated Plaintiff's constitutional rights by deliberately and knowingly discarding critical relevant evidence housed on the

DVR that would have shown Shavers in possession of the murder weapon at all relevant times. Defendants fabricated, or shaped, the narrative of the trial by discarding evidence that would have contradicted testimony by Shavers and other witnesses.

54. The individual Defendants' fabrication of evidence clearly affected the decision of the jury because Shavers was the primary witness testifying against Plaintiff. Shavers testified consistent with his coerced statement and contrary to his first reports to the police where he initially admitted responsibility for the crime.

55. Plaintiff's constitutional rights not to be deprived of liberty and due process by fabricated evidence were clearly established before September 15, 2011. *See Jackson v. City of Cleveland*, 925 F.3d 793, 825 (6th Cir. 2019) (Fabrication of evidence claim clearly established in 1975).

## COUNT II

### 4TH AMENDMENT MALICIOUS PROSECUTION BY ALL DEFENDANTS

56. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

57. At all times, Plaintiff had a clearly-established constitutional right, secured by the 4th Amendment, not to be seized and deprived of liberty as a result of fabrication of evidence and/or knowingly-made false statements or material

13

omissions by a government officer, including a police officer, acting in an investigative capacity in order to manufacture probable cause. *Franks v. Delaware*, 438 U.S. 154; 98 S.Ct. 267; 457 L.Ed.2d 667 (1978); *Mills v. Barnard*, 869 F.3d 472, 480 (6th Cir. 2017) ("The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person.")

58. Each individual Defendant influenced or participated in the initiation of criminal prosecution by participating in the creation of manufactured evidence.

59. But for the false statements and material omissions in their police reports, and the creation of fabricated evidence set forth above, probable cause would have been lacking; such conduct constituting a claim of federal "malicious prosecution" under the 4th Amendment.

60. Plaintiff's constitutional right to be free from illegal seizure and continued detention without probable cause based upon fabrication of evidence, knowingly-made false statements and/or omissions of materials facts by a governmental official acting in an investigatory capacity, including police officers, was clearly established before September 15, 2011, the earliest possible date for police misconduct. *Yancey v. Carroll County*, 876 F.2d 1238, 1243 (6th Cir. 1989) ("[A]n officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but

for these falsities the judge would not have issued the warrant.").

61. The voluntary dismissal of criminal charges on July 13, 2020, coupled with the Wayne County Prosecutor's Office's statement that *"[t]he newly-discovered evidence in this case substantiates that Mr. Khalil was not involved in the crimes for which he was charged and convicted of in this case"* constitute a "favorable termination" of the underlying criminal case.

62. The total time Plaintiff spent behind bars in jail and/or prison, or otherwise restrained from complete liberty, from September 15, 2011, to July 13, 2020 totaled **3,225 days, or 8 years, 9 months, and 29 days**.

## COUNT III

### 14TH AMENDMENT DUE PROCESS "*BRADY*" VIOLATIONS BY DEFENDANTS

63. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

64. At all times, Plaintiff had a constitutional right not to be deprived of due process as a result of the withholding of material exculpatory or impeachment evidence by a government officer.

65. The individual Defendants each deliberately and knowingly chose not to disclose material exculpatory and impeachment evidence (the fabricated evidence and information from eyewitnesses that the security guard shot the scrapper as set forth above) to the prosecutor in violation of their constitutional

obligation under *Brady v Maryland*, 373 U.S. 83 (1963) and its progeny, which would have resulted in no arrest warrant being issued, or a finding of lack of probable cause at the preliminary exam or an acquittal at trial; such conduct constituting a claim for a due process "*Brady* violation" under the 14th Amendment.

66. Plaintiff's right to *Brady* evidence, and the police officer's constitutional duty to turn over material and apparent *"Brady"* evidence, was clearly established before September 15, 2011, the earliest date for Defendants' misconduct. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Moldowan v. City of Warren*, 578 F.3d. 351, 382 (6th Cir. 2009) (citing cases back to 1964).

67. Defendants' knowing and intentional due process violations was a direct and proximate cause of Plaintiff's wrongful conviction and imprisonment.

## PRAYER FOR DAMAGES

WHEREFORE, Plaintiff, EDWARD KHALIL, prays for damages for his wrongful detention and imprisonment, in violation of the Constitution, as set forth above, jointly and severally as to all Defendants, including:

a. Past and future compensatory damages against all defendants in a minimum amount of Sixteen Million Dollars (**$16,000,000.00**);

b. Punitive damages as to Defendant, WILSON, in a minimum amount of Eight Million Dollars (**$8,000,000.00);**

c. Punitive damages as to Defendant, MILLER, in a minimum amount of Eight Million Dollars (**$8,000,000.00);**

    d. Punitive damages as to Defendant, THOMAS, in a minimum amount of Eight Million Dollars **($8,000,000.00);**

    e. Reasonable attorney fees and costs pursuant to 42 U.S.C. §1988;

    f. The costs and disbursements of this action pursuant to 42 U.S.C. §1920; and,

    g. Such other and further relief as appears just and proper.

                                     *s/Wolfgang Mueller*
                                     MUELLER LAW FIRM
                                     Attorney for Plaintiff
                                     41850 W. 11 Mile Road, Ste. 101
                                     Novi, MI 48375
                                     (248) 489-9653
                                     wolf@wolfmuellerlaw.com
                                     (P43728)

Dated: November 2, 2021

## JURY DEMAND

Plaintiff demands a jury trial in the above-captioned matter.

                                     *s/Wolfgang Mueller*
                                     MUELLER LAW FIRM
                                     Attorney for Plaintiff
                                     41850 W. 11 Mile Road, Ste. 101
                                     Novi, MI 48375
                                     (248) 489-9653
                                     wolf@wolfmuellerlaw.com
                                     (P43728)

Dated: November 2, 2021