UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EDWARD KHALIL,

                              Plaintiff,

v.                                              Case No. 21-12577
                                                Honorable Shalina D. Kumar
ERNEST WILSON, et al.,

                              Defendants.

---

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT (ECF NO. 92), AND DENYING AS MOOT
DEFENDANTS' MOTION TO DISMISS (ECF NO. 94)**

---

## I.    INTRODUCTION

Plaintiff Edward Khalil sues retired City of Detroit police officers,
defendants Karen Miller, Ernest Wilson, and Derryck Thomas, asserting
they violated his constitutional rights by fabricating evidence, withholding
exculpatory evidence, and maliciously prosecuting him in connection with
his 2014 wrongful conviction for second degree murder. *See* ECF No. 22.
Defendants move for summary judgment, or, in the alternative, to dismiss
Khalil's First Amended Complaint ("FAC") as a litigation sanction. ECF Nos.
92, 94. These motions are fully briefed, ECF Nos. 99, 100,102, 103, and
the Court held oral argument on April 29, 2025. For the following reasons,
the Court grants defendants' motion.

Page **1** of **39**

## II.    FACTUAL AND PROCEDURAL BACKGROUND

This wrongful conviction action arose from a fatal shooting which occurred on September 15, 2011 at 931 Covington in Detroit ("the Building"). ECF No. 102-2. Anthony Jones ("Jones" or "the victim") was shot and killed as he attempted to exit the Building through a window. *Id*. Jones, along with his friend Arthur Richardson ("Richardson"), had been illegally stripping copper from the Building while it was undergoing renovation. *Id*. Khalil and his business partner, Parminder Saroya ("Parry") owned the Building and the building across the alley from it ("980 Whitmore"). Khalil and Parry employed Charles Shavers ("Shavers"), who lived in an apartment in 980 Whitmore, for on-site maintenance and security[1] at the Building. ECF No. 92-34, PageID.4753-54. Parry's teenage son, Jason, also helped at the partnership's buildings. See ECF No. 92-9, PageID.2539.

---

[1] Khalil and others regarded Shavers as the Building's security guard but Shavers disputes that was ever his role. *See, e.g.*, ECF No. 92-9, PageID.2501-39; ECF No. 92-10, PageID.2762; ECF No. 92-12, PageID.2912; ECF No. 92-15, PageID.3092; ECF No. 92-20, PageID.3529, 3540; ECF No. 92-32, PageID.4476; ECF No. 92-34, PageID.4757; ECF No. 92-35, PageID.4972; ECF No. 92-41, PageID.5129; ECF No. 92-4, PageID.2089.

Sometime around 3 a.m. on September 15th, Roger Lillard ("Lillard"), who lived in a neighboring building, called Jason, with whom Lillard was friendly, to tell Jason that burglars were tearing out the plumbing in the Building. ECF No. 92-9, PageID.2502. At 4:18 a.m., Khalil called 911 to report a potential break-in at one of his properties. ECF No. 92-8, PageID.2213. Parry, Jason, Shavers and the responding officers were already outside the Building when Khalil arrived a short time later. *See id*. at PageID.2213-22. The responding officers entered the basement of the Building with Khalil, Parry, Jason, and Shavers to review the surveillance footage for the Building, but the officers refused to search for the intruders on the other floors because the Building had no lighting. *Id*. at PageID.2236; ECF No. 92-13, PageID.2999. According to the declaration of one of those responding officers, when the officer explained to Khalil that they would not be searching the rest of the Building, Khalil told her to "give me your gun, I'll shoot them myself." ECF No. 92-13, PageID.2999.

After the police left, Khalil and the Sayoras left the Building between 5:30 a.m. and 5:45 a.m. and headed toward home and their hotel, respectively. ECF No. 92-8, PageID.2240, 2247. According to Khalil, Shavers phoned him while he was driving home to tell him that he had

located the intruders inside the Building. *Id*. at PageID.2248. Khalil then called the Sayoras and they all returned to the Building, arriving back to the building at roughly the same time. *Id*. at PageID.2248-49, 2253. According to Khalil, they arrived back at the Building after Shavers shot Jones. ECF No. 102-3, PageID.7002-03.

Instead of calling the police, Khalil, Parry, Jason, and Shavers drove to a coffee shop where they discussed the situation and Khalil consulted with two different attorneys by telephone. ECF No. 92-8, PageID.2261-63. At approximately 8 a.m., the men returned to the crime scene and, at 8:14 a.m., Khalil called 911 to report the shooting. *Id*. at PageID.2420. Officers Joseph Molinaro ("Molinaro") and Douglas McDonald ("McDonald") reported to the Building at 8:19 a.m. and were greeted by Khalil, Parry, and Shavers.[2] ECF No. 92-15, PageID.3067.

Molinaro testified that Khalil told him that Shavers just shot someone and that when Molinaro asked what happened, Shavers replied softly, "I shot him." *Id*. at PageID.3069, 3075. Although Molinaro had his body camera microphone turned on, Shavers' statement cannot be heard on the

---

[2] Jason had apparently departed the scene prior to the officers' arrival. ECF No. 92-8, PageID.2264; *see also* ECF No. 102-15.

audio recording, and Shavers denies saying it.[3] *See id.* at PageID.3075;

ECF No. 92-16, PageID.3192; *see also* ECF No. 102-6, PageID.7019

(McDonald's Arrest Report stating that Shavers admitted to the shooting at

the scene). When Molinaro tried to follow up on that statement, Khalil

interjected that they would not comment further without their attorneys

present. ECF No. 92-15, PageID.3076.

While talking with Khalil and Shavers, Molinaro heard someone

yelling for help from the floor above them. *Id*. Molinaro ultimately found

Richardson, who had been hiding after Jones was shot. Molinaro described

Richardson as relieved to be arrested (for illegally scrapping in the

Building) and told Molinaro that:

> Those Arabs are crazy. They wanted to kill us. They kept circling
> the building and had a shotgun….[Jones] went to exit out the
> window, I heard a loud boom and I ran and hid and didn't come
> out till you guys arrived. I was hiding for a couple hours, and I
> could hear them. It's like they were hunting me, I was scared.

*Id*. at PageID.3079-80. Richardson testified that before Khalil, Parry, and

Jason initially left the Building, and after the police responding to the break-

in left the scene, he and Jones heard Khalil tell Shavers that: "I don't want

---

[3] Shavers likewise denied hearing Khalil tell Molinaro that Shavers shot the
victim. ECF No. 92-16, PageID.3304

these motherf'ers arrested, I want them killed." ECF No. 92-11, PageID.2799.

Richardson stated in his initial police statement, given on the afternoon of the shooting, that when he looked out the window from the third floor, where he returned after Jones was shot, he saw Khalil carrying a single barrel rifle with a light brown handle heading toward the front door and heard him say "we got him." ECF No. 92-36, PageID.5082.

Shantele Henderson ("Henderson"), who lived in a third-floor apartment in 950 Whitmore, which also neighbors the Building, told Wilson and another officer at the scene that she looked out her living room window after the sound of the shot fired awakened her and saw Khalil walking around with a shotgun, proclaiming, "I shot that motherf'er." ECF No. 92-18, PageID.3338; *see also* ECF No. 92-7, PageID.2149.

Shavers, Khalil, and Parry were all arrested at the scene on the morning of September 15, 2011. Parry was eventually released and returned to Canada, where he resided. Thomas, a homicide detective assigned to the case, obtained a search warrant for the surveillance recordings from the DVR at 980 Whitmore. Wilson, the commander of the homicide task force and an evidence technician officer, executed the

warrant, secured the DVR, entered it into evidence and gave it to the video evidence expert to examine in the forensic lab. ECF No. 92-23, PageID.3571-73; ECF No. 92-33, PageID.4689-90.

Two days after the shooting, both Richardson and Henderson identified Khalil from a photo array as the man they saw carrying the shotgun and proclaiming that he shot Jones. ECF No. 92-16, PageID.3211; ECF No. 92-7.

Miller, the officer in charge of the investigation, submitted a Request for Warrant to the prosecutor listing Khalil and Shavers as potential defendants. ECF No. 92-2. The Request for Warrant contained Miller's synopsis of the investigation to date, along with all the police reports, witness statements, and other evidence. *See* ECF No. 92-19, PageID.3430; ECF No. 92-30, PageID.4268. A few days later, the prosecutor recommended charges against Khalil. ECF No. 92-39.

A preliminary examination ("PE") was held on three separate days over a four-month period beginning in December 2011. *See* ECF Nos. 92-32, 92-31, 92-20. Richardson and Henderson testified on behalf of the prosecution; Khalil called Molinaro and McDonald. *See id*. Neither Khalil

nor Shavers testified at the PE. *See id*. Parry and Jason Sayora did not give statements to the police or testify at the PE. *See id.*

Consistent with their initial statements to the police, Richardson and Henderson testified to seeing Khalil with the shotgun immediately after hearing the gunshot and to hearing him comment that "he got the motherf'er." ECF Nos. 92-32, PageID.4486-87, 92-31, PageID.4378-79. Consistent with his report, Molinaro testified that Shavers admitted to shooting Jones. ECF No. 92-20, PageID.3516-17. The judge presiding over the PE noted that a question of fact existed over whether Khalil committed the crime but determined that there was probable cause to bind him over for trial. ECF No. 92-20, PageID.3540-41.

Shavers testified that after he was released from jail in September 2011, he left Detroit to stay with his girlfriend in Chicago. ECF No. 92-16, PageID.3193.  Shavers testified that Khalil contacted him by way of his girlfriend's phone to tell him to take the blame for the shooting, promising to take care of anything Shavers needed. *Id*., at PageID.3194. Shavers testified that he immediately contacted Wilson to report the phone call from Khalil. *Id*.

Thomas travelled to Chicago to take a statement from Shavers in November 2011. *Id*. at PageID.3195. Thomas recorded that statement and then handwrote the salient portions of the recording for Shavers to sign. ECF Nos. 92-3, 92-4. Shavers testified at trial that he did not have an attorney at the time he gave the statement in Chicago and had not made any deal with the prosecutor beforehand. ECF No. 92-16, PageID.3234. Shavers' police statement about the events of September 15, 2011 are consistent with Khalil's until the shooting. Shavers told Thomas that after the police responding to the break-in call left the scene, Khalil and the Sayoras stood talking in the alley between the Building and 980 Whitmore and he went to his apartment. ECF No. 92-5, PageID.2137. Shavers stated that he made a cup of coffee and sat by the window. *Id*.  Approximately 30 to 40 minutes later he saw Khalil in the alley, gesturing for Shavers to bring him the shotgun. *Id*. Shavers stated that he retrieved the silver shotgun with the wooden handle from the office of 980 Whitmore. *Id*. He brought the gun to Khalil who took it, turned away from Shavers, and aimed toward the front of the building. *Id*. at PageID.2138.

Shavers reported that Khalil fired a single shot, and that Shavers did not see or realize that it hit anyone. *Id*. at PageID.2138-39. Khalil walked

back toward Shavers and made a phone call; Shavers believed he was

calling the police. *Id*. at PageID.2139. Khalil gave Shavers the gun and told

him to put it in the office, but Shavers put it in the basement instead. *Id*.

When he returned Khalil was gone. *Id*. After a few minutes, Shavers called

Khalil who told him that they would pick him up in a few minutes. *Id*. Khalil

and Parry returned to the scene, and they drove with Shavers to a coffee

shop. *Id*. Shavers reported that at the coffee shop, Khalil asked him about

his criminal record and when Shavers asked him why, Khalil told him he

wanted Shavers to keep the gun. *Id*. at PageID.2140.

Shavers told Thomas that Khalil later called him on his girlfriend's

phone to tell him that Parry was still in custody and that the money to

continue renovating the Building was tied up until he was released. *Id*.

According to Shavers, Khalil told Shavers to tell the police that he shot

Jones so that Parry could be released. *Id*. Thomas asked and Shavers

denied receiving any threats or promises for giving his statement. He also

denied being harmed or forced to give his statement. *Id*. at PageID.2141.

In 2012, Khalil was tried before a jury and convicted of murder in the

first degree and a felony firearm charge. *See* ECF Nos. 92-10, 92-12, 92-

25, 92-27, 92-33, 92-41. At the trial, Shavers testified that he saw Khalil

shoot toward the Building. On cross examination, Shavers denied ever saying he shot the victim. ECF No. 92-12, PageID.2966. Molinaro testified that Khalil told him Shavers shot Jones and Shavers admitted to shooting the victim when the responding officers arrived on the scene. ECF No. 92-15, PageID.3069, 3075. Richardson and Henderson testified that they saw Khalil with the shotgun and heard him proclaim that "he got them" or "got that motherf'er." ECF Nos. 92-10, PageID.2761, 92-41, PageID.5175, 5180. Neither Khalil, nor either of the Sayoras testified at the trial.

After Khalil retained new counsel, the trial court granted Khalil's motion for new trial, finding Khalil was denied effective assistance of counsel because his former counsel would not allow him to testify at trial. *See* ECF No. 92-53.

In 2014, Khalil testified at his second trial, as did Molinaro, Shavers, Richardson, and Henderson.[4] *See* ECF Nos. 92-11, 92-15, 92-16, 92-34.

---

[4] The parties did not include a transcript of Henderson's testimony from the 2014 trial, though counsel at that trial both refer to Henderson's testimony in their closing arguments and Henderson indicated at her deposition that she testified at both trials. ECF Nos. 92-34, PageID.4901-46, 92-18, PageID.3333. At the 2012 trial, Henderson testified that she saw Khalil "parading" around the building where Jones was shot with a shotgun, and heard him say "we killed that motherf'er, I got him. He's not coming out tonight." ECF No. 92-41, PageID.5180. This testimony is largely consistent with Henderson's testimony from the PE, ECF No. 92-31, PageID.4384, the

The 2014 jury convicted Khalil of second-degree murder and the felony firearm charge.

In 2020, Khalil petitioned the Wayne County Conviction Integrity Unit ("CIU") to investigate his conviction. The prosecutor agreed to vacate Khalil's conviction based in part on unsworn interviews with Parry and Jason Sayora, who had refused to give statements or testify during Khalil's prosecution. ECF No. 92-16, PageID.3148; *see also* ECF No. 92-22.

Khalil's FAC asserts that Miller, Wilson, and Thomson fabricated evidence, namely Shavers' testimony that Khalil shot Jones, and that a woman answered Khalil's phone when Shavers called him after the shooting and that they fabricated the narrative of the trial by discarding a DVR which purportedly contained evidence that would have impeached the testimony of Richardson and Henderson (Count I). ECF No. 22. The FAC also asserts a malicious prosecution claim, contending that the defendants fabricated the evidence to create probable cause (Count II). *Id*. Finally, the FAC alleges that the defendants' failure to disclose Shavers' fabricated

---

statement she made to the police shortly after the shooting, ECF No. 92-7, PageID.2149, and her deposition testimony, ECF No. 92-18, PageID.3338-83. Based on the comments from the 2014 trial's closing arguments and all her prior testimony, the Court presumes the 2014 jury heard similar testimony from Henderson.

testimony, a DVR containing evidence that would have impeached

Richardson and Henderson's testimony, and a witness statement from

Lillard that supported Khalil's claim that Shavers shot Jones constituted

*Brady* violations[5] (Count III). *Id.*

## III.   ANALYSIS

### A. Standard of Review

#### 1.  Summary Judgment

Summary judgment is appropriate where the evidence in the record,

viewed in its entirety, shows that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter

of law. *See* Fed. R. Civ. P. 56(a). When a party files a motion for summary

judgment, it must be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot

be or is genuinely disputed must support the assertion by: (A) citing to

particular parts of materials in the record . . .; or (B) showing that the

materials cited do not establish the absence or presence of a genuine

---

[5]A *Brady* violation, so named for *Brady v. Maryland*, 373 U.S. 83 (1963), refers to the violation of an accused's due process rights by the State's suppression of evidence favorable to the accused.

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The standard for determining whether summary judgment is appropriate is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Additionally, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party, who must come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. However, mere allegations or denials

in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Id.* at 248, 251.

If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323. The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

2. Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Mauer*, 9 F.4th 416, 430 (6th Cir. 2021) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity at the summary judgment stage applies "unless the facts, when viewed in the light

Page **15** of **39**

most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Id*. (citation omitted); *see also Moderwell v. Cuyahoga Cnty.*, 997 F.3d 653, 659–60 (6th Cir. 2021). If defendants raise qualified immunity on summary judgment, the plaintiff bears the burden of showing that a defendant is not entitled to it. *Williams*, 9 F.4th at 430 (citing *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)).

Although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right. *Id*. at 430–31 (citing *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)).

### B. Fabrication of Evidence

As recently clarified by the Sixth Circuit, courts recognize stand-alone fabrication-of-evidence claims under the Fourth and Fourteenth Amendments. *Clark v. Abdallah*, 131 F.4th 432, 446-47 (6th Cir. 2025). Fabricated evidence presented to and relied upon by a judge in finding

Page **16** of **39**

probable cause violates the Fourth Amendment. *Id*. at 447 (citing *King v. Harwood*, 852 F.3d 568, 588-90 (6th Cir. 2017)). "Because Fourth Amendment claims turn crucially on the lack of probable cause, a law-enforcement defendant may defeat liability by showing that, notwithstanding the fabricated evidence, probable cause supported detention." *Id.* (citing *Tanner v. Walters*, 98 F.4th 726, 735-36 (6th Cir. 2024)). And, where, as here, defendants assert "qualified immunity, a plaintiff must establish: (1) a substantial showing that the defendant stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause" to overcome an investigating officer's entitlement to immunity. *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003); *see also Tanner*, 98 F.4th at 733 (substantial showing standard employed in instances where plaintiff asserts that false information was material in finding probable cause). "Where qualified immunity is asserted, the issue of probable cause is one for the court since 'the entitlement is immunity from suit rather than a mere defense to liability.'" *Vakilian*, 335 F.3d at 517 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991)).

Conversely, under the Fourteenth Amendment, "[b]ecause the core of the right at issue here is not the deprivation of liberty but the right to a fair trial, 'a stand-alone fabrication-of-evidence claim can survive without regard to probable cause.'" *Clark*, 131 F.4th at 447 (quoting *Tanner*, 98 F.4th at 733). Fabricated evidence violates Fourteenth Amendment due process rights when that evidence "is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Jackson v. City of Cleveland*, 925 F.3d 793, 815 (6th Cir. 2019); *see also Clark*, 131 F.4th at 447.

Khalil asserts fabrication of evidence claims under both the Fourth and Fourteenth Amendment by arguing that "Miller, Wilson, and Thomas fabricated evidence to manufacture probable cause for plaintiff's arrest and [to] strengthen the case for conviction." ECF No. 102, PageID.6974.

### 1. Miller

Khalil argues that Miller fabricated evidence[6] by falsely asserting that "Khalil[,]…positioned outside of the window and to the right of Jones,

---

[6] Khalil also argues Miller fabricated evidence by omitting information from the warrant request, but the Court construes these alleged omissions as the withholding of evidence and thus discusses them in the section addressing that issue. *See* ECF No. 102, PageID.6974.

Page **18** of **39**

armed with a Salvage Arms Springfield shotgun…fires one time striking Jones in the neck causing his death" on the warrant request she prepared for the prosecutor. ECF No. 102-2, PageID.6995.

Setting aside whether Miller's statement on the warrant request amounts to a deliberate falsehood or reckless disregard for the truth, Khalil's Fourth Amendment fabrication-of-evidence claim against Miller fails because the statement was not material to the finding of probable cause. *See Vakilian*, 335 F.3d at 517. Indeed, in finding that probable cause existed for charging Khalil with open murder, the state district judge presiding over the PE made clear that she relied primarily, if not exclusively, upon the testimony of eyewitnesses Richardson and Henderson. *See* ECF No. 92-20, PageID.3540-41. The transcript of the PE contains no reference to Miller's statement from the warrant request nor did Miller testify at the PE. *See* ECF Nos. 92-20, 92-31, 92-32. Because Khalil points to no evidence that Miller's statement was material to the finding of probable cause at the PE, and the record clearly establishes that probable cause existed independently from the purportedly fabricated statement,[7]

---

[7] As discussed *infra*, III.D., Khalil's counsel conceded during oral argument that Richardson and Henderson's testimony provided probable cause to bind Khalil over for trial.

Page **19** of **39**

Khalil's Fourth Amendment fabrication-of-evidence claim against Miller
does not withstand defendants' motion.

Khalil's Fourteenth Amendment fabrication-of-evidence claim fares no
better. Khalil does not argue that there was a reasonable likelihood that
Miller's statement affected the jury's decision. Nor could the record before
the Court support such an argument.

Molinaro testified that when he arrived on the scene, Khalil indicated
that Shavers shot at the intruder and that Shavers stated that he shot
Jones. ECF No. 92-15, PageID.3069, 3075. He further testified that
Shavers said this in a quiet voice and that when he asked Shavers to
repeat it, Khalil responded for Shavers that he would not make any further
comments without an attorney. *Id*. at PageID.3076. Molinaro testified that
he had his body camera microphone on but that when he listened to the
audio recording, he could not hear Shavers say that he shot the victim; he
could hear only Khalil tell him not to comment further. *Id*. at PageID.3085.
That audio recording was played for the jury. *See id*. at PageID.3082-89.

Molinaro also testified to finding Richardson, who had been hiding in
the building and had called out to alert the police to his presence. *Id*. at
PageID.3079-80. Molinaro testified that Richardson appeared relieved to

be arrested and told Molinaro that: "Those Arabs are crazy. They wanted to kill us. They kept circling the building and they had a shotgun…I was hiding for a couple hours, and I could hear them. I could hear them talking, they wanted to kill me. It's like they were hunting me, I was scared." *Id*.

But the jury heard extensive conflicting testimony. Molinaro testified that, when responding to one of several calls from Khalil in the weeks or month preceding Jones' shooting, Khalil, who was frustrated by the frequent break-ins at his buildings and the ineffectiveness of the police to stop them, told Molinaro that he would get a shotgun and take care of the problem himself. *Id*. at PageID.3065. Molinaro also testified that Khalil reported that the shooting had just happened, not that it had occurred two hours earlier. *Id*. at PageID.3070.

Miller testified at the 2014 trial that she, as the officer in charge, provided her synopsis of the evidence gathered by the other investigating officers in the investigative report contained in the warrant request, and that, in her opinion, Khalil was the shooter. ECF No. 92-16, PageID.3212-20. She testified that the warrant request she submitted to the prosecutor also contained the actual reports of the investigating officers, that those reports indicated Shavers admitted to shooting Jones, and that the

prosecutor, not the officer in charge, decides whether to charge a suspect. *Id*.

The jury also heard Shavers testify that he never said he shot Jones and that he could not hear any statement to that effect when he listened to the audio recording from Molinaro's body camera microphone. ECF No. 92-16, PageID.3192. Shavers also testified that Khalil contacted him through his girlfriend about a week after the shooting to tell him they needed him to say he did it so that they could get Parry released and that "he would take care of everything if I needed it." *Id*. at PageID.3194. Shavers further testified that he did not shoot Jones or fire the shotgun on September 15, 2011. *Id*. at PageID.3196. The jury also heard the lengthy cross-examination of Shavers, revealing the inconsistencies in his testimony. *See id*. at PageID.3197-3208, 3229-3307.

Of course, the jury also heard the testimony of Richardson, who testified that he heard Khalil tell Shavers "I don't want these motherf'ers arrested, I want them killed," ECF No. 92-11, PageID.2798-99, as well as Henderson's testimony that she saw Khalil "parading" around the building where Jones was shot with a shotgun, and heard him say "we killed that motherf'er, I got him. He's not coming out tonight." ECF No. 92-41,

PageID.5180. And, in the 2014 trial, Khalil himself testified. ECF No. 92-34, PageID.4742-4899.

Given the volume of testimony and evidence presented to the jury, which both supported and conflicted with the summative statement from Miller's investigation report about Khalil shooting Jones, there can be no reasonable likelihood that the single statement, even if knowingly fabricated, would have affected the decision of the jury. For these reasons, Khalil's fabrication-of-evidence claims against Miller are without merit and Miller is entitled to qualified immunity and summary judgment on these claims.

### 2. Wilson

Khalil also asserts that Wilson fabricated evidence against him, violating his Fourteenth Amendment due process rights, by coercing Shavers to testify that Khalil fired the shotgun, killing Jones.[8] ECF No. 102,

---

[8] The FAC also asserts that the defendants fabricated Shavers' testimony that a woman answered Khalil's phone when Shavers called him after the shooting. Khalil does not address the defendants' arguments for summary judgment of this claim. Accordingly, that claim is deemed abandoned. *See Dulaney v. Flex Films (USA), Inc.*, 2021 WL 3719358, *5 (6th Cir. Aug. 23, 2021) (collecting cases) ("a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment").

PageID.6975-79. But Khalil offers no evidence to support this argument. Instead, he invites the Court to speculate. He theorizes that Wilson must have coerced and threatened Shavers during his periodic calls to Shaver in Chicago. *Id*. He asks the Court to wonder why the prosecution did not offer Shavers' testimony at the PE. *Id*. He conjectures that Shavers' statement must have been coerced because he gave it without an attorney present. *Id*. Khalil assumes that Thomas told Shavers what to say during the many breaks in his recorded statement. *Id*.

Khalil relies on the unpublished decision from a sister court in this district, *Watkins v. Healy*, 2019 WL 3777631 (E.D. Mich. Aug. 12, 2019), to support his argument that testimony coerced by a police officer sustains a fabricated-evidence claim. But this case is both procedurally and substantively inapposite.

The *Watkins* court found that the wrongfully convicted plaintiff's plausible allegations that the police officer defendant coerced a witness into making a statement the officer knew to be untrue sufficiently stated a fabricated-evidence claim so as to survive the defendant's motion to dismiss. *Id*. at *13. Because the *Watkins* court was deciding a motion to dismiss, it did not assess the evidentiary support for the plaintiff's claim as

Page **24** of **39**

this Court must do here on defendants' motion for summary judgment. *See id*.

Moreover, according to the plaintiff's allegations in *Watkins*, the defendant police officer forced a witness to implicate Watkins after that witness had recanted earlier statements accusing him of killing the victim, declaring those statements as untrue. *Id*. at *13. The witness told the defendant officer that Watkins had nothing to do with the murder and that the witness and a third party, not Watkins, killed the victim. *Id*.

To the contrary here, the record reflects that Shavers has never wavered from his contention in November 2011, two months after the shooting, that Khalil shot Jones and Shavers has denied ever saying he shot Jones or hearing Khalil tell the police officers on the scene that he had shot the victim. ECF No. 92-16, PageID.3192, 3304. Nor has Shavers ever asserted or suggested that anyone coerced or threatened him to make his statement or to testify that Khalil was the shooter. Indeed, he specifically denied that he had been coerced, threatened, or promised anything at the time he gave his statement. ECF No. 92-5, PageID.2141. Contrary to Khalil's suggestion that Shavers altered his story to secure a plea deal, the evidence indicates that Shavers made his recorded statement asserting

Page **25** of **39**

that Khalil shot Jones in November 2011, one year before entering the plea deal with the prosecutor. ECF Nos. 92-4, 92-5, 92-24.

In sum, the Court has not been presented with evidence that Shavers ever recanted his assertion that Khalil was the shooter or declared that assertion to be untrue. Nor has Khalil pointed to any evidence that Wilson, or anyone, coerced, threatened or promised Shavers anything in exchange for his statement identifying Khalil as the shooter. Without any evidence that Shavers' statement or testimony was coerced or otherwise fabricated by Wilson, the other defendants, or anyone else, Wilson is entitled to qualified immunity and summary judgment in his favor is warranted for Khalil's fabricated evidence claim.

### 3.  Thomas

Khalil does not argue that Thomas fabricated evidence against Khalil.[9] *See* ECF No. 102, PageID.6974-79. Accordingly, Thomas is also entitled to summary judgment on Khalil's fabricated evidence claims.

### C. Withholding Evidence (*Brady* Violations)

---

[9] The Court acknowledges that Thomas, not Wilson, took Shavers' November 2011 recorded and signed statement. *See* ECF Nos. 92-4, 92-5. Even if Khalil intended the argument it asserts against Wilson to apply to Thomas, the Court would likewise reject it, for the same reasons discussed here relative to Wilson.

Khalil also argues that defendant officers violated his due process rights by withholding exculpatory evidence. "Police officers, like prosecutors,…'can commit a constitutional deprivation…by withholding or suppressing exculpatory material.'" *Clark*, 131 F.4th at 455 (quoting *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009)). A *Brady* claim, as this type of claim is known, has three elements: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Id.* (quoting *Jackson*, 925 F.3d at 814) (internal marks omitted).

1. Miller

Khalil argues that Miller violated his due process rights by not including evidence of Shavers' statement that he shot the victim, or the video evidence recovered from the surveillance camera from the building across the street from the building where the shooting took place. ECF No. 102, PageID.6974. Khalil's *Brady* claim against Miller fails under the second prong because Miller did not suppress the evidence that Khalil claims was withheld. *See Clark*, 131 F.4th at 455.

Although Miller did not mention in her investigative report that Shavers told the officers first to the scene that he had shot the victim, she did include those officers' reports, which noted Shavers' statement, in the Request for Warrant package she provided to the prosecutor. ECF Nos. 92-30, PageID.4268, 92-19, PageID.3430; *see, e.g.,* ECF No. 92-17, PageID.3321; ECF No. 102-6. Because Miller provided the officer reports including Shavers' statement to the prosecutor, she did not withhold this exculpatory information. *See Moldowan*, 578 F.3d at 379 (*Brady*, as applied to police officers, only requires that they provide exculpatory materials to the prosecutor).

Nor does Khalil supply evidence that Miller suppressed the surveillance video. Miller testified at her deposition that she produced the request for warrant to the prosecutor before the video evidence would have been available. ECF No. 92-30, PageID.4275. She testified that it took months for the sergeant in charge of forensically processing the video evidence to download it and that it may have been downloaded and produced after she retired. *Id*. at PageID.4330. The original prosecutor for Khalil's case testified at deposition that she did not remember when she

received the video evidence from the police but that she knew she had received it. ECF No. 92-19, PageID.3431-32.

Because Khalil cannot provide proof that Miller herself, or anyone else for that matter, suppressed the evidence he claims was withheld or suppressed, his *Brady* claims against Miller are without merit and Miller is entitled to qualified immunity and summary judgment of these claims.

### 2. Wilson and Thomas

Khalil asserts that Wilson and Thomas committed a *Brady* violation by hiding the fact that they paid some of Henderson's expenses while Khalil's criminal case was pending. First, as noted by defendants, Khalil advances this theory for the first time in his response brief. "It is well-settled that a plaintiff may not expand its claims to assert new theories in response to summary judgment...." *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). The proper procedure for plaintiffs to assert a new claim unearthed in discovery is to amend the complaint in accordance with Rule 15(a). *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2723 (3d ed.

Supp. 2005)). To permit a plaintiff to expand its claim for the first time in response to the defendant's summary judgment motion "would subject defendants to unfair surprise." *Id*.; *see also Vonderhaar v. Waymire*, 797 F. App'x 981, 990-91 (6th Cir. 2020).

Although Khalil did not learn of the financial support Henderson received from Wilson and Thomas until Henderson's deposition in April 2024, he could have moved the Court for leave to amend his complaint before the dispositive motion deadline in August 2024 if he had wished to expand his *Brady* claims to include the suppression of this information. But he did not do so and allowing Khalil to assert this separate instance of alleged evidence suppression in response to defendants' motion for summary judgment would prejudice defendants. *See Tucker*, 407 F.3d at 788. Accordingly, Khalil cannot now level a *Brady* claim based on Wilson and Thomas's alleged suppression of the fact that they provided financial support to Henderson.

Nevertheless, even if the Court were to address the merits of Khalil's new claim against Wilson and Thomas, it would find it lacking. As noted above, to establish a *Brady* violation by a police officer, a plaintiff must establish prejudice from the withholding of exculpatory evidence. *Clark*, 131

Page **30** of **39**

F.4th at 455. Prejudice requires a demonstration "that the allegedly suppressed evidence was material." *Jackson*, 925 F.3d at 815. "Evidence is material when there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *France v. Lucas*, 836 F.3d 612, 630 (6th Cir. 2016) (internal quotation omitted). Reasonable probability is defined as the "probability sufficient to undermine confidence in the outcome." *Id*.

Khalil cannot demonstrate that he was prejudiced by the deprivation of the evidence that the police provided financial support to Henderson. The Court acknowledges that this evidence would have been favorable to Khalil for purposes of impeaching Henderson, but Khalil cannot demonstrate that the allegedly suppressed evidence[10] was material.

First, the critical aspect of Henderson's testimony that, immediately after hearing the gunshot, she saw Khalil with the shotgun from her living room window and heard him say "we got that motherf'er" would not be undermined by Henderson receiving financial assistance from the police

---

[10] Defendants contest that they withheld this information. According to Wilson's declaration, Henderson's relocation would have been paid with official funds, and he would have disclosed the department's assistance to Henderson to the prosecutor. ECF No. 103-2, PageID.7235.

before testifying. Henderson's trial testimony to this effect corroborated the statement she gave to the police immediately after the incident, long before the police provided her with financial assistance. ECF No. 92-7, PageID. 2149. Because the condemning component of Henderson's testimony was on record before she received any financial support from the State, that she received such an incentive would not have impugned the veracity of the inculpatory testimony she offered. Thus, Khalil cannot demonstrate reasonable probability that his use of the withheld information to impeach Henderson's testimony would have changed the outcome of his trials.

Additionally, to the extent the withheld evidence of police financial support for Henderson would have effectively impeached Henderson's testimony, Khalil can still not demonstrate a reasonable probability that the result of the proceedings would have been different. Richardson's trial and preliminary examination testimony and his initial statement to the police matched Henderson's in pertinent part, namely that he saw Khalil with the shotgun immediately after the shooting and heard him say that "we got him" or "we got the motherf'er." ECF Nos. 92-10, PageID.2761, 92-11, PageID.2810-11; 92-32, PageID.4487-88. Because Richardson's testimony provided the same inculpatory evidence as Henderson's, there is no

reasonable probability that the result of Khalil's trials would have been different if Henderson's testimony had been effectively impeached by the allegedly withheld information.

In sum, even if it were appropriate to consider Khalil's allegation asserted for the first time in his response brief, the evidence of Henderson's financial support from the police was not material and thus its purported suppression did not prejudice Khalil. Wilson and Thomas are entitled to qualified immunity and summary judgment on Khalil's *Brady* violation claims.[11]

### D.  Malicious Prosecution

To succeed on a malicious prosecution claim, a plaintiff must prove: (1) the defendant made, influenced, or participated in the

---

[11] The FAC also asserts that defendants withheld exculpatory evidence by not interviewing or informing the prosecutor of eyewitness Lillard, who told police he saw only Shavers holding the shotgun after the shooting and that he heard Shavers tell the police that he shot the victim. ECF No. 22, PageID.58-9, ¶ ¶ 23, 24; ECF No. 92-21, PageID.3554-55, ¶ 15; ECF No. 92-9, PageID.2507, 2511. Defendants argue in their motion for summary judgment that Khalil was not prejudiced by the exclusion of Lillard from the investigation because Khalil and his defense attorneys knew about Lillard and his anticipated testimony by the time of the PE, but they did not call Lillard as a witness in either trial. *See* ECF No. 92, PageID.2048-49. Khalil does not address defendants' argument regarding Lillard and thus has abandoned his claim regarding the alleged suppression of Lillard's testimony. *See Dulaney*, 2021 WL 3719358, at *5.

decision to prosecute the plaintiff; (2) there was no probable cause

for the prosecution; (3) as a consequence of the legal proceedings,

the plaintiff suffered a deprivation of liberty apart from the initial

arrest; and (4) the criminal proceeding was resolved in the plaintiff's

favor. *France*, 836 F.3d at 625.

Defendants do not dispute Khalil's satisfaction of the last two

elements, but they argue that they are entitled to summary judgment

because they did not make, influence, or participate in the decision to

prosecute Khalil, and probable cause for his prosecution existed

without the purportedly fabricated or omitted evidence.

Because the existence of probable cause is dispositive to Khalil's

malicious prosecution claim against all defendants, the Court addresses

that element first. A state court determination of probable cause following a

preliminary examination precludes a finding of no probable cause unless

the judicial determination resulted from false evidence proffered by an

officer. *Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007); *see also*

*Alexander v. Harrison*, 2022 WL 13983651, at *6 (6th Cir. Oct. 24, 2022).

Khalil's brief in response to defendants' motion asserts only that

Miller's allegedly false statement in the investigator's report provides the

basis for the malicious prosecution claim. But at oral argument, Khalil

conceded that Richardson and Henderson's testimony provided probable

cause to bind Khalil over for trial.  Accordingly, the Court cannot conclude

that the probable cause determination resulted from Miller's allegedly false

statement in the investigator's report.  Khalil's malicious prosecution claim

against Miller thus fails and summary judgment in favor of Miller is

appropriate.

At oral argument, counsel for Khalil argued for the first time that

fabricated evidence, namely Shavers' allegation that Khalil was the

shooter, supplied the probable cause to initiate the prosecution and that

fabricated evidence provided sufficient basis for a malicious prosecution

claim against Wilson and Thomas. However, the Court need not analyze

this argument. First, Khalil's failure to assert this argument in his response

brief waived any argument that Wilson or Thomas's conduct comprised

malicious prosecution. *See Dulaney*, 2021 WL 3719358, at *5. Second,

even if the Court were to consider this argument, it fails factually. Miller

completed the Request for Warrant package on September 17, 2011, and

the prosecuting attorney recommended the charges against Khalil on

September 19, 2011. Shavers refused to speak to the police at the time of

his arrest and maintained his silence until Thomas took Shavers' statement in November 2011. Thus, even if the statement Shavers gave Thomas was fabricated evidence, it could not have influenced the already-made decision to prosecute Khalil.

Moreover, Khalil offers no evidence that any of the defendants made, influenced, or participated in the decision to prosecute. "To be liable for participating in a decision to prosecute, an officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (internal quotation omitted). "[M]erely filing an allegedly misleading case report, without more active participation, qualifies only as 'passive or neutral' participation and is thus an insufficient basis for a malicious-prosecution claim." *Richards v. Washtenaw Cnty.*, 818 F. App'x 487, 493 (6th Cir. 2020). However, liability "extends to an officer who included falsehoods in his investigatory materials, knowing that prosecutorial reliance is likely," and "where those materials actually influenced the prosecutor's ultimate decision to bring charges." *Tanner*, 98 F.4th at 734 (quoting *Jones v. City of Elyria*, 947 F.3d 905, 918 (6th Cir. 2020)) (cleaned up). As discussed above, even if Khalil provided evidence (which he has not) that Thomas or

Wilson fabricated evidence by inducing Shavers to give a false statement, that statement came months after the prosecutor decided to charge Khalil with Jones's shooting.

Additionally, a plaintiff must show "some element of blameworthiness or culpability in the participation—albeit less than malice." *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). More than mere negligence or innocent mistake is required to create liability for malicious prosecution. *See id*. Accordingly, for an officer's misrepresentation to support a malicious prosecution claim, courts require "deliberate or reckless falsehoods result[ing] in arrest and prosecution without probable cause." *Id*.

Khalil does not allege or provide evidence to support a contention that Miller was deliberate or reckless in including the statement that Khalil was positioned outside the window and shot Jones in the neck. To the extent that conclusory statement could be deemed false, Khalil offers no evidence that Miller did not mistakenly or negligently include it in her report.

Further, there is no evidence that Miller knew the single conclusory statement in the investigator's report would sway the prosecutor to bring charges against Khalil or that it did, in fact, influence the prosecutor's decision. Both Miller and the prosecutor testified at deposition that the

Request for Warrant included "police reports, scene reports, …medical examiner's report" along with the investigator's report containing Miller's statement. ECF No. 92-19, PageID.3430; *see also* ECF No. 92-30, PageID.4268. Molinaro and McDonald's reports, included in the warrant package, clearly noted Shavers' statement that he shot the victim. The warrant request package also contained Richardson and Henderson's statements detailing their eyewitness accounts of seeing Khalil immediately after the shooting with the gun and hearing his statements that he shot the victim. Miller testified that she expected that the prosecutor would review the reports containing the conflicting evidence and the prosecutor testified she did indeed review those reports when she decided to prosecute Khalil. *See* ECF Nos. 92-19, PageID.3430; ECF No. 92-30, PageID.4268.

In sum, Wilson and Thomas's alleged fabrication of evidence occurred well-after the decision to prosecute Khali was made and Khalil offers no evidence that Miller deliberately or recklessly included a false statement in her investigative summary, that Miller knew that the prosecutor would rely on that statement, or that the prosecutor relied on the allegedly false statement in the decision to prosecute Khalil. This absence of evidence that defendants participated in the prosecution decision further

supports granting their motion as it relates to Khalil's malicious prosecution claims.[12]

## IV.   CONCLUSION

For these reasons, the Court **GRANTS** defendants' motion for summary judgment (ECF No. 92) and **DISMISSES** Khalil's FAC (ECF No. 22) with prejudice. Accordingly, defendants' motion to dismiss as a litigation sanction (ECF No. 94) is **DENIED AS MOOT**.

s/ Shalina D. Kumar
SHALINA D. KUMAR
United States District Judge

Dated: May 14, 2025

---

[12] Michigan malicious prosecution causes of action share the federal cause of action's four elements with the added requirement of malice. *See Davis v. Gallagher*, 951 F.3d 743, 747 (6th Cir. 2020); *Clark*, 131 F.4th at 454. Accordingly, Khalil's state malicious prosecution claim fails for the same reasons as his federal claim does.